Cornelius M. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 28315.
United States Tax Court
1951 Tax Ct. Memo LEXIS 27; 10 T.C.M. (CCH) 1124; T.C.M. (RIA) 51340; November 30, 1951
*27 Petitioner entered into a partnership agreement on January 2, 1945 with his two sons, then aged 28 and 22. The partnership succeeded a corporation and the income of the business was received from personal services rendered its clients by the partners and some sixty or more employees. During the taxable year 1946 petitioner's elder son rendered services throughout the year and his younger son rendered part-time services thereafter. Each partner withdrew his respective share of income from the business and the sons spent or invested these sums without accounting to their father. The Commissioner contends the younger son was not a bona fide partner during the first eight months of the taxable year. Held, the younger son was a member of the partnership throughout the entire taxable year, Commissioner v. Culbertson, 337 U.S. 733,. Richard P. Jackson, Esq., and William B. Van Buren, Esq., for the petitioner. Michael Waris, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income tax for the year 1946 of $66,140.03. The deficiency arises by virtue of an addition *28 by respondent of $83,049.45 to the partnership income reported by petitioner. The net income of the partnership was reported on individual tax returns of petitioner and his two sons in the following amounts: Partner
Per cent
Amount
Cornelius M. Smith
40
$55,616.28
Cornelius M. Smith, Jr.
30
41,712.20
Raleigh L. Smith
30
41,712.20
Total
[100]
$139,040.68
The Commissioner determined that the partnership earned $138,665.73 during the year 1946 and taxed the entire amount to petitioner. Respondent now concedes on brief that "petitioner's older son was a valid partner for the entire year 1946 and that his younger son was a valid partner for the last four months of 1946." The only issue to be decided in this proceeding is whether petitioner's younger son was, for Federal income tax purposes, a valid member of the partnership during the period January 1, 1946 to September 1, 1946. Findings of Fact Petitioner was married and resided in New Rochelle, New York during the calendar year 1946. He filed an income tax return for the year 1946 with the collector of internal revenue for the third district of New York. Petitioner did not file a joint return with *29 his wife, but she was claimed on his return as an exemption, and it was stated on his return that she did not file a separate return. Petitioner was born and raised in Baltimore, Maryland. While attending Baltimore City College petitioner was a correspondent for the Baltimore Sun. Petitioner planned to study medicine at Johns Hopkins but was prevented by the condition of family finances. Petitioner continued to work for the Sun, and he was assigned to cover the activities of a fund-raising campaign which resulted in the raising of $100,000 for the construction in Baltimore of a sanatorium for tubercular patients. It was here that petitioner first became interested in the field of fund raising to which he has since devoted most of his business life. Upon leaving the Baltimore Sun, petitiner was associated in turn with newspapers in Philadelphia and New York and with a Chicago publishing house before turning his full attention to the fund-raising business with Frederick Barber. Petitioner decided to limit his activities to capital fund raising for hospitals and he disassociated himself from Barber who was engaged in general fund raising and he commenced business for himself. In *30 1919 the petitioner, Allen S. Will, former city editor of the Baltimore Sun, and Charles D. Folsom, a New York attorney, formed the partnership, Will, Folsom and Smith, which was engaged solely in hospital fund raising. Will subsequently withdrew from the partnership and petitioner and Folsom continued the business under the same name until Folsom's death in 1933. Following the termination of the partnership upon Folsom's death, the petitioner, on the advice of his attorneys, formed the corporation, Will, Folsom and Smith, Inc., to carry on the business. The stockholders of the new corporation were the petitioner's wife, Mary, who held 13 shares, Dwight Folsom, son of the former partner, with 13 shares, Lewis Stoneham with 10 shares, and Harte B. Hill with five shares. In 1936 Hill decided to move to the West and his stock was surrendered to the corporation. In 1937, Dwight Folsom who had been employed by the partnership and the corporation left to establish his own business. Folsom sold his stock in the corporation to Mary Smith and Louis Stoneman, the remaining stockholders. During the period from 1942 to 1944, Stoneman's health deteriorated perceptibly and, in mid-1944 when it *31 became apparent that he was no longer able to perform his functions as head of the public relations department of the business, negotiations relative to his complete retirement were undertaken. In December 1944 Stoneman's stock was purchased by petitioner and Stoneman retired from the business. The retirement of Stoneman and the belief of petitioner and his sons that the war would be ended in the not too distant future combined to make December 1944 seem a suitable time to consummate petitioner's dream and hope that his sons would form a partnership with him to carry on his fund-raising business. The petitioner had discussed with various members of his staff his hopes for the formation of a partnership with his two sons, Cornelius M. Smith, Jr., and Raleigh L. Smith. Sometime during 1945 petitioner told his staff that his sons were associated in business with him. The balance sheet of Will, Folsom and Smith, Inc., as of December 31, 1944 showed a capital stock account of $205 and a deficit from operations of $705.11. The corporation was liquidated and petitioner took over its assets and assumed its liabilities. A partnership agreement was drawn up by petitioner and his two sons *32 whereby 40 per cent of the firm's profits and losses were allocated to petitioner and 30 per cent allocated to each of his two sons. The partnership agreement was signed by petitioner and his two sons at home and bears the date January 2, 1945. The partnership agreement provided only for the division of profits and losses. It contains no provisions whatsoever relating to the ownership of partnership property, management, control or any other phases of the business. Each of the three partners contributed $1,000 in capital to the partnership. Pursuant to the provisions of the New York Penal Code petitioner and his two sons signed a Certificate of Conducting a Partnership Business on December 30, 1944, and filed it with the County Clerk of New York County on January 8, 1945. A Partnership Certificate dated January 13, 1945 was filed with the Central Hanover Bank of New York. The Certificate gave each partner full authority to sign checks for the partnership and represent the partnership in all matters. The organization operated as a partnership from January 1945 until March 1947 when it was dissolved because of the decision by Cornelius M. Smith, Jr., hereinafter called Magers, to make *33 some other line of endeavor or activity his life's work. Following the dissolution of the partnership a corporation was organized to take over the active business on April 1, 1947. The corporate form of operation was decided upon so that Magers might retain an interest through his position as a stockholder while Raleigh continued to take an active part in the business as an officer and director. The stock in the new corporation, Will, Folsom and Smith, Inc., was held in the following manner: Number of
Name of stockholder
shares
Per cent
Cornelius M. Smith, Jr.
75
30.0
Raleigh L. Smith
74
29.6
Mary Buxton Smith
100
40.0
Cornelius M. Smith
1
0.4
Total
250
100.0
No large amount of capital was required in the operation of Will, Folsom and Smith. The business was primarily one of personal services and during 1946 the income was earned largely from the efforts of petitioner and his staff of experienced and able employees. During the taxable year the business employed over 60 persons, five of whom received salaries in excess of $15,000 per year. The organization has now and had during the taxable year a staff of over 60 people, including clerks, *34 typists and others who were the home office force. The highlyskilled and technical services of the organization as fund-raising counsel are not offered on the basis of a percentage of the moneys raised but rather on the basis of a fixed compensation determined in advance by a consideration of the length of time required for the project in question, the personnel involved and the scope of the project in terms of the objective and the geographical coverage. When the services of the organization are retained by a hospital or community committee seeking expansion of hospital facilities, a filed staff is assigned to the locality involved. The filed staff, which is closely supervised by the home office, first makes a careful survey of the resources of the community and neighboring towns so that the amount which may be raised may be accurately predicted. Next, a survey of public opinion is conducted concerning the adequacy of existing hospital facilities, and volunteer committees are organized. Advertising and publicity are furnished through the use of prepared printed matter, radio programs, etc., these services being handled largely by the New York office. The staff on the scene, headed *35 by its director and associate director, along with acquainting the community with its need for new hospital facilities, guides the volunteer committees in their efforts to raise the necessary funds. These funds are gathered from three sources: namely, individual memorial gifts, corporate contributions based on equations devised by this organization showing the use which corporate employees will have for the new hospital facilities, and finally the general public. With the organization divided between its home office and whatever staffs happened to be in the field at a particular moment, many conferences were required to keep those at home apprised of campaign progress and to facilitate the making of decisions on major questions in the prosecution of a campaign or in the acceptance of a new project. Through the years such discussions had frequently been held by petitioner and his directors at his home and his sons grew up in an atmosphere which made their father's business a constant part of their home life. For many years, Magers and Raleigh had known of their father's hope that they would join him as partners in his business. With this in mind they had always been interested in *36 the various business conferences and discussions held in the home. Magers, petitioner's elder son, was born in September 1916 and was twenty-eight years of age at the time of the formation of the partnership in January 1945. Magers graduated from high school in 1935, attended Columbia University one year and was graduated from the University of Chicago in 1939 and from Harvard School of Business Administration in June 1941 where he was awarded the degree of Master of Business Administration. Along with choosing courses at both Chicago and Harvard which would give him the best possible foundation for a career in fund raising, Magers worked full time in his father's office in the Summer of 1937. In the Summer of 1940 Magers, on the advice of his father, worked as a salesman of office machines in the thought that this experience in dealing with people would later prove valuable in the fund-raising field. Following graduation from Harvard Business School, Magers was faced with the prospect of a year in the Army under the peacetime draft law, but, hoping to apply his six years of college education in a more useful manner in the defense program, he secured employment with the Sperry *37 Gyroscope Company as supervisor of their priorities and allocations department. This department was principally engaged in calculating the raw materials requirements for each of the many government contracts Sperry was working on, this function calling for technical analysis of such things as production schedules and production flow time. As the government orders increased and the priorities system became more involved, the job expanded and the number of people working under Magers' supervision increased from two to twenty or more. While employed by Sperry, Magers continued to reside with his parents and thus, outside of working hours was able to increase his knowledge of his father's business. With the entry of the United States into World War II, Magers, desirous of taking a more active part, applied for a commission in the Navy, but was found not qualified for sea duty because of poor eyesight. The Navy indicated to Magers that he might obtain a waiver on his sight deficiency but nothing developed despite his periodic inquiries. In January 1944 Magers left Sperry Gyroscope and joined the Merchant Marine. He was assigned to duty in the Army Transportation Corps which operated a *38 large fleet of vessels in and out of various theatres of war. In between the voyages to which he was assigned by the Army Transportation Corps, Magers returned to his parents' home which was then, and still is, his residence. During these visits at home which were, at times, of ten days to two weeks' duration, Magers actively participated in business discussions and conferences. One of Magers' periods at home occurred in December of 1944 and it was during this visit that the partnership agreement was drawn up and signed. The $1,000 capital contribution of Magers was originally paid by his father as a loan but Magers had sufficient funds in his savings account to cover this amount, which was repaid later in 1945. Magers remained on active duty with the Army Transportation Corps until September 1945 and during these months in 1945 Magers enjoyed periodic visits to his home at which time he discussed matters of business with his father. Upon discharge from the Army Transportation Corps in September 1945, Magers immediately commenced full-time service with the organization which continued until May 24, 1946, when he returned to temporary duty with the Army Transportation Corps upon the *39 advice of his draft board. In September of 1946, Magers was again released from duty with the Army Transportation Corps whereupon he immediately returned to full-time work in the partnership. While the major part of Magers' fulltime work for the partnership in 1945 and 1946 was performed in the New York office, he did serve as associate director for the entire Cooley-Dickinson Hospital campaign in Northampton, Massachusetts, in late 1945 and early 1946. He also attended and participated in field conferences in connection with other campaigns and he also participated in home office conferences on campaigns. While Magers' father was present at most conferences, on one occasion Magers and his brother went to St. Luke's Hospital in Denver, Colorado, in the Fall of 1946 to discuss expansion possibilities. Magers' work in the New York office was concerned with administrative and policy matters, Magers, without having to secure his father's consent withdrew funds from the partnership as he needed them. Magers withdrew at various times: during 1945 $17,358.36, during 1946 $40,000 and during 1947 $24,512.60. As of the close of the partnership books in August 1947 Magers had withdrawn all of *40 the profits credited to his account, and the money was placed in his own bank account, invested or spent without accounting to his father. On the basis of his experiences in the active pursuit of partnership business, Magers gradually reached the decision that fund-raising was not the line of business to which he wished to devote his life, and thus he disassociated himself from the partnership in 1947. The partnership was succeeded by a corporation, and Magers purchased for $7,500, 75 shares of its stock. Raleigh L. Smith, petitioner's younger son, was born in August 1922 and was twenty-two years of age when the partnership agreement was signed. Raleigh was graduated from high school in 1939 and entered Yale University in September 1940 where he majored in economics. Like his brother Raleigh grew up in a home atmosphere which bred familiarity with his father's business. He discussed business matters with his father and brother and was present when conferences were held at the petitioner's home with other members of the organization. Raleigh planned a career for himself in his father's organization and he prepared himself by choosing courses at Yale which would provide him with *41 the best background for this line of endeavor. In the Fall of 1942, Raleigh applied for acceptance in the Navy Officers' Training Program and when found ineligible because of nearsightedness he enlisted in the Army Enlisted Reserve Corps. In February 1943, shortly after having completed his junior year at Yale, Raleigh was called to active duty and remained in the Army until February 1946. From July 1943 to January 1946 Raleigh was assigned to the Army Air Force Liaison office at the Signal Corps engineering laboratories in Spring Lake, New Jersey, and, as the laboratories employed some 8,000 civilians and very few military personnel, the base was operated on a civilian schedule. Thus, Raleigh had no military duties to be performed during the week ends. Raleigh often returned to his home for week-end visits during 1944 and 1945 and while at home he discussed the business of Will, Folsom and Smith and also participated in conferences and discussions. Raleigh signed the partnership agreement dated January 2, 1945 and Certificate of Conducting a Partnership Business dated December 30, 1944, which was filed with the county clerk, New York County. In January 1946 Raleigh was transferred *42 to Langley Field in Virginia, from which he returned home once or twice on the week end and after a month's duty there he was discharged from the Army in February 1946. The day after he was discharged from the Army Raleigh visited Yale to enquire about resumption of his studies there. He was advised that by returning to school in March of 1946 he could complete his requirements for a degree by the end of August 1946. While at Yale from March through August 1946, Raleigh participated in a campaign then in progress for the Yale-New Haven Community Hospital. His class schedule was such that he was able to attend some conferences with the campaign director and undertake various assignments in the prosecution of the campaign. In September 1946, following his August graduation from Yale, Raleigh commenced full-time work with the partnership in the New York office where he performed various administrative functions. In the Fall of 1946, subsequent to his graduation from Yale, Raleigh attended conferences in the field with his father, brother, or other employees and represented with his brother the partnership in conferences held in Denver, Colorado, and alone in El Paso, Texas. Acting *43 under his power to sign for the partnership Raleigh at various times signed payroll checks, checks for some of his drawings of partnership profits, and checks in payment of bills for services or equipment for the partnership such as repairs to company automobiles. Raleigh continued to work full time for the partnership until its dissolution in March 1947 and has since served on a full-time basis for the successor corporation. Raleigh subscribed to 74 shares and paid $7,400 for them, and in addition has been and is presently a director in the corporation. Raleigh withdrew at various times from the partnership profits. The total withdrawals were: $18,400.02 in 1945, $36,000 in 1946 and $27,462.60 in 1947. When the partnership books were finally closed, all the profits credited to his partnership account had been withdrawn by him. Such sums were placed in Raleigh's personal bank account, or used by him to purchase bonds, pay his income taxes or purchase personal items. The withdrawals were made without accounting to his father and were made without obtaining his father's permission. The $1,000 capital contribution of Raleigh was originally paid by his father as a loan, but it was *44 repaid by check in 1947. Following the signing of the partnership agreement, the clients then being served were informed that a partnership had been formed to take over the business of the predecessor corporation and the clients agreed to a continuation by the partnership of the service formerly rendered by the corporation. After such notification, bills were thereafter rendered to clients on the letterhead, Will, Folsom and Smith, the name of the copartnership. Following the formation of the partnership, the advertisements placed by the organization appeared under the name, Will, Folsom and Smith, and did not include the "Inc." which had heretofore appeared. Petitioner announced to The American Association of Fund Raising Counsel that his sons had become his partners. Both Magers and Raleigh often accompanied their father to the association meetings, which were held about six times per year, and they were introduced to members they had not previously met. Petitioner also discussed the partnership with his sons with others active in the fund-raising field. In response to a request from Dun & Bradstreet for information regarding the organization, a letter was written giving the *45 history of the business, the nature of the business, the changes in the structure of the organization, including the partnership in question, and giving the names of petitioner and his two sons as partners. In response to a letter from the Better Business Bureau, dated April 9, 1946, seeking information regarding the nature of the organization, a letter was written containing a complete history of the business, including its change in structure to the partnership form. In 1944 petitioner received a salary of $39,340.13 from the corporation and in 1947 he received from the corporation an annual salary of $36,000. In 1947 as an employee of the corporation, Raleigh received an annual salary of $5,200. There was a bona fide intent on the part of petitioner and his two sons to join together and operate the business of Will, Folsom and Smith as a partnership during the entire year of 1946, and Raleigh Smith was a valid partner in the business throughout the taxable year. Opinion BLACK, Judge: In his brief respondent concedes that petitioner's son, Magers, was a partner in Will, Folsom and Smith during the taxable year 1946 and that 30 per cent of the net income of the partnership *46 is taxable to Magers. Respondent also has conceded that petitioner's son Raleigh was after September 1, 1946 a valid member of the partnership and that 30 per cent of the partnership income earned after that date is taxable to Raleigh. Accordingly, the only remaining issue is whether during the first eight months of 1946 Raleigh was a member of a partnership consisting of petitioner, Raleigh and Magers. The partnership agreement between petitioner and his two sons was entered into on January 2, 1945. This partnership was formed to succeed to a corporation, whose business was counseling and assisting hospitals in fund-raising campaigns. The stock of the corporation at the time of its liquidation was owned by petitioner and his wife. Only a small amount of capital was required to operate the partnership. The partnership income was received for personal services, and 60 highly-skilled persons were employed by the business in rendering services to its clients. At the time the partnership agreement was entered into Magers, then age 28, was serving in the Army Transportation Corps and Raleigh, then age 22, was serving in the United States Army. Raleigh was discharged from the Army in *47 February, 1946. Some services were rendered to the business by Raleigh during the first eight months of 1946 though they do not appear to be very important services. In determining whether a partnership is real within the meaning of the Federal revenue laws the test is not merely an objective one, considering whether "vital services" are rendered or whether a "capital contribution" is made. The test is a subjective one, requiring a determination of whether the parties did or did not intend in good faith to join together as partners in the present conduct of the business, . In arriving at this determination all the facts are to be considered and the fact that the members are free to, and do, enjoy the fruits of the enterprise is strongly indicative of the reality of their participation, Throughout the entire taxable year petitioner's two sons possessed the power to bind the partnership, were empowered to write checks, did write checks and made personal withdrawals when and as they desired. During the taxable year substantial sums were withdrawn from the business by Raleigh, both prior *48 and subsequent to September 1, 1946. The respective partners withdrew all the profits earned by the business during 1946, the withdrawals being made principally in 1946 with the balance being withdrawn during 1947. In arriving at our determination we have considered objective facts such as the past history of the business, its nature, the partners themselves, their experience and education and other events occurring before and during the taxable year. To be considered also in determining whether the parties entering into an agreement had a bona fide intent to create a partnership are the acts of the parties occurring subsequently. The partnership was dissolved in 1947 with the business continued in corporate form. As an employee, stockholder and director of the succeeding corporation Raleigh has remained in the fund-raising business started by his father. The question to be determined is to be answered by the bona fide intent of the parties, , and after a consideration of all the facts it is our opinion that petitioner and his two sons in good faith intended to operate the business throughout the entire year as a partnership. We have *49 determined, therefore, that petitioner's son Raleigh was a valid partner of Will, Folsom and Smith throughout the entire year 1946. See . In this latter case, we said: "If a father can not make his adult sons partners with him in the business where they have grown up in the business and have attained competence and maturity of experience, then the law of partnership is different from what we understand it to be. Of course, it is true, as respondent argues, that petitioner could have continued to operate the business of Fischer Machine Co. as a sole proprietorship, and if he had done that, the entire net income of the business would have been taxable to him. On the other hand, he had the right, by agreement, to take in his two sons as partners and operate the business as a partnership. This latter thing he did, and we can see no reason which would justify us in disregarding it." Decision will be entered under Rule 50.